Filed 11/9/21  P. v. Johnson CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> JAMES WILLIS JOHNSON, <br><br> Defendant and Appellant. | F081252 <br><br> (Super. Ct. No. BF134515A) <br><br><br> **OPINION** |

## THE COURT[*]

APPEAL from an order of the Superior Court of Kern County.  John R. Brownlee, Judge.

Scott Concklin, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Daniel B. Bernstein, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*]    Before Levy, Acting P. J., Peña, J. and Smith, J.

## INTRODUCTION

In 2013, a jury convicted petitioner James Willis Johnson of the second degree murder of his one-month-old son[1] (Pen. Code,[2] § 187, subd. (a)).  For this offense, the trial court sentenced petitioner to a term of 15 years to life, stayed pursuant to section 654.

In 2019, petitioner filed a petition for resentencing pursuant to section 1170.95.  The court denied the petition without issuing an order to show cause on the ground petitioner was not prosecuted or convicted under a theory of felony murder or murder under the natural and probable consequences doctrine, as required for resentencing relief under section 1170.95.

On appeal, petitioner asserts he established a prima facie claim for resentencing relief, and the court therefore erred in denying the petition without issuing an order to show cause or holding an evidentiary hearing.  The People concede error but dispute the standard of review to be applied on remand.  We agree with petitioner and reverse.

## FACTUAL AND PROCEDURAL HISTORY

In this court's opinion on petitioner's direct appeal,[3] we described the facts leading to his convictions as follows:

> "Denise Belmonte was Johnson's partner and the mother of his three children.  The third child, a boy named Jordan, was the victim in this case. He was born on October 6, 2010, and was just over a month old when he died.
>
> "Belmonte called 911 around 9:20 a.m. on November 10, 2010.  A paramedic who responded found Belmonte on the floor administering CPR to Jordan.  No one else was in the room.  Jordan was not breathing and had

---

[1] Petitioner was convicted of additional offenses as described below.

[2] Undesignated statutory references are to the Penal Code.

[3] We grant the People's unopposed request for judicial notice of the records in (*People v. Johnson* (Mar. 17, 2015, F067359) [nonpub. opn.].)  (Evid. Code, §§ 452, subd. (d)(1), 459, subd. (a).)

2.

no pulse. The paramedic observed rigor mortis in Jordan's jaw when he attempted to place a breathing tube. He concluded that Jordan was dead.

"Jordan was taken to an emergency room, where he was declared dead at 9:45 a.m. An emergency room doctor believed Jordan died earlier than 8:30 p.m. the previous night. An autopsy found the cause of death to be multiple blunt force injuries. Both arms, both legs, and two ribs were fractured. The liver was lacerated and bled internally; this was probably the predominant injury. The brain was swollen and there was bleeding inside the skull. These injuries were consistent with Jordan having been punched or having collided with a solid object after being thrown. There were at least two blows, one to the front of the abdomen on the right side and one on the back left.

"There also were burns, which appeared to predate the other injuries, as they had become infected and had started to turn green. These were third-degree burns covering Jordan's buttocks and genitalia and his lower abdomen. They were caused by contact with a liquid at a temperature of 140 degrees or more for no more than 45 seconds.

"Hypovolemic shock, which is a kind of circulatory collapse, was caused by the bleeding from the internal injuries, as well as by the burns, and led to death. The pathologist who conducted the autopsy concluded that the manner of death was homicide. Jordan's blood tested positive for THC and acetaminophen.

"The district attorney filed an information against Johnson and Belmonte. It charged both defendants with three counts: (1) premeditated murder (Pen. Code, § 187, subd. (a)); (2) assault on a child under age eight with force likely to produce great bodily injury and resulting in death (§ 273ab); and (3) willfully causing or permitting a child to suffer unjustifiable physical pain or mental suffering, under circumstances likely to produce great bodily injury or death (§ 273a, subd. (a)). In connection with count 3, the information alleged for sentence-enhancement purposes that Johnson and Belmonte each personally inflicted great bodily injury on Jordan. (§ 12022.7, subd. (d).) The information charged Johnson alone with resisting arrest, a misdemeanor. (§ 148, subd. (a)(1).)

"Belmonte entered into a plea agreement. In exchange for her testimony against Johnson and her plea of guilty to child endangerment and voluntary manslaughter, Belmonte received a determinate prison term of 15 years.

3.

"Belmonte was the prosecution's primary witness at trial. She testified that she met Johnson in 2005, when she was 16 and Johnson was 26. Johnson already had a son. Their first child together, Jade, was born in 2008 and their second, James, in 2009.

"Belmonte testified that Johnson was physically abusive to her throughout their relationship. She also testified that she had no bond with James because he was a boy; she said her mother favored boys and she wanted to do the opposite. County authorities removed both children from the parents' custody.

"Belmonte regained custody of Jade in September 2010, after falsely assuring the social worker that she was separated from Johnson and living on her own in a motel. Before giving birth to Jordan in October 2010, Belmonte admitted she was not really living at the motel, and she gave Jade to the social worker to be placed with James. Belmonte and Johnson convinced the social worker that Belmonte would be living with Johnson's mother after Jordan was born, however, so Jade was returned to Belmonte when she left the hospital with Jordan. Immediately after this, Belmonte and Johnson resumed living together.

"Belmonte testified about Johnson's behavior toward Jordan during the month Jordan lived. She found recordings Johnson had made with his phone of speeches Johnson made to Jordan. In these recordings, Johnson spoke to Jordan in an adult manner about adult subjects, such as growing marijuana. Johnson also took Jordan to a room in the apartment where marijuana was grown and tried to show Jordan how to grow it. He tried to show Jordan how to box. He pushed Jordan's legs up so his feet touched his head, trying to make Jordan more flexible. Johnson held Jordan upside down by the legs and swung his body. He swaddled Jordan improperly. Sometimes Johnson swaddled Jordan in such a way as to hold Jordan's pacifier in mouth, because Johnson did not like it when Jordan spit the pacifier out. Other times, Johnson swaddled Jordan so that Jordan's arms were behind his back. Belmonte told Johnson not to do these things, and Johnson said he would do whatever he wanted if he really was Jordan's father. During Jordan's life and Belmonte's pregnancy with Jordan, Johnson often expressed doubt about whether he was Jordan's father, sometimes leading to physical abuse of Belmonte.

"According to Belmonte's testimony, Jordan sustained the burns on his lower body on November 3, 2010, a week before his death. That night, Belmonte, Johnson, and Jade were in their living room playing a video game when Jordan's diaper needed to be changed. Johnson took Jordan to the bathroom to rinse him off. Belmonte and Johnson sometimes used baby

4.

wipes when changing Jordan, but other times they washed him off in the sink. While Johnson and Jordan were in the bathroom, Belmonte heard Jordan cry, but this was not unusual, since Jordan did not like water. When Johnson came back with Jordan, however, he was 'frantic' and said he had burned Jordan. Belmonte could see that Jordan's buttocks and genitals had been burned; they were bright red.

"Belmonte wanted to take Jordan to the doctor, but Johnson said they would lose the kids, he would go to jail, and he would kill her. They argued, and Johnson hit Belmonte.

"They decided to go to a store to get something to treat the burns. They went to a Walgreens and got some ointment, which they applied over the next few days. Jordan cried when anything touched the burns, and after a day or two they turned brown and then green. Belmonte gave Jordan Tylenol or Motrin for pain, and she saw Johnson rub Vicodin on Jordan's gums. She also saw Johnson blowing marijuana smoke into Jordan's mouth. Belmonte never sought medical treatment for Jordan because Johnson would not allow her to do so, though she asked many times.

"Belmonte testified that on November 9, 2010, the night before the morning on which Jordan was found dead, Jordan was quieter than usual and was moaning even when no one was touching him. They had argued over the cost of diapers that day, and Johnson had hit Belmonte several times and deliberately broken her cell phone. After they had run several errands and eaten dinner, Belmonte was going to go out to another store. Johnson became angry and said Belmonte could not leave. He grabbed her hair, punched her, and pushed her into the bedroom. In the bedroom, Johnson choked Belmonte until she was unconscious.

"When Belmonte regained consciousness, Jade was on top of her. Belmonte heard Jordan crying. She went into the living room and saw Johnson with Jordan. Johnson was holding Jordan upside down by one leg. Belmonte tried to take Jordan from Johnson. Johnson 'swung Jordan backward and threw him on the bed.' Jordan hit a couch and landed on a bed beside it. Belmonte went toward Jordan, but Johnson picked him up first. Johnson and Belmonte had a tug-of-war over a blanket. Johnson got the blanket and wrapped Jordan in it. Belmonte tried to grab Jordan. Johnson said Jordan would not shut up and punched him in the chest. Johnson also attacked Belmonte and tried to choke her again. Jordan cried after being punched, but then became quiet. Johnson put Jordan in a car seat. Belmonte touched Jordan and saw that he was breathing. Belmonte and Johnson continued arguing for a while and then fell asleep some time after midnight. Belmonte woke up and checked on Jordan once during the

5.

night.  She offered him a bottle, but he did not wake up.  She took Jordan's temperature and found it to be 93.1, which she thought was normal.

"Belmonte and Johnson woke up in the morning, and after a while, Johnson checked on Jordan and found he was nonresponsive.  Belmonte washed Jordan and put clean clothes on him.  Johnson and Belmonte argued about whether Jordan was breathing.  Jordan continued to be nonresponsive and Belmonte called 911.  She administered CPR until the ambulance came.  Johnson took Jade into the bedroom and did not come out while the emergency personnel were present.  Belmonte went to the hospital with Jordan in the ambulance.

"At the hospital, medical staff told Belmonte Jordan was dead.  Belmonte sent Johnson a text message and spoke to him by phone, telling him to come to the hospital.  He did not come until after Belmonte had left.  Belmonte was arrested the same day.

"Belmonte testified that she exchanged letters with Johnson while they both were incarcerated after Jordan's death.  She said, '[In one] of the first letters I got he asked me to take the case for him or he would take it all the way to the box.'  She admitted that, in one of her letters to Johnson, she graphically described their sex life.  She testified that she was going to see him soon when she wrote the letter and did it to discourage him from threatening her as he had done at a previous court appearance.

"Belmonte denied that she hurt Jordan or did anything to assault him physically.

"On cross-examination, Belmonte was impeached with a juvenile adjudication for petty theft, a conviction of using stolen credit cards, a conviction of writing checks with insufficient funds, and several lies she told to county child welfare officials.  She also admitted that, after she was arrested, she made false statements to police about the apparent severity of Jordan's burns, the steps she took in response to the burns, and her living arrangements.  Further, she admitted she was 'involved in a tax scam' while in custody.

"David Nelson, a paramedic who responded to Belmonte's 911 call, testified that when he arrived, Belmonte was 'distraught' and did not give a 'straight answer' when he asked what happened to Jordan.  Fire Captain Basil Rios testified that when he came to the scene, Belmonte was screaming and did not give complete answers to his questions about what happened to Jordan.

6.

"Terri Haynes, a police officer, testified that she was at the hospital with Belmonte after Jordan was declared dead. Belmonte asked Haynes whether Haynes thought Jordan died of sudden infant death syndrome. Contrary to Nelson's testimony, Haynes testified that the paramedics told her Belmonte did not seem upset when they contacted her at the apartment. Haynes also said she did not recall Belmonte showing emotion at the hospital. But Haynes's partner, Molly Hessler, testified that she also was present at the hospital and that Belmonte appeared traumatized when Jordan was declared dead.

"Detective Martin Heredia testified that he arrested Belmonte and interviewed her a number of times. He spent about four hours with her. During the interview, Belmonte initially said she did not live in the apartment. She never told Heredia that Johnson threw or punched Jordan. She did not even admit that Johnson was present when Jordan was injured until one of the later interviews. At some point during Heredia's questioning, however, Belmonte did blame Johnson for the injuries and burns that caused Jordan's death.

"In September and October 2012, almost two years after Jordan's death, Belmonte was interviewed four times by Patricia Poeschel, an investigator with the district attorney's office. Poeschel testified that at first, Belmonte did not say Johnson threw or punched Jordan and did not mention any argument or fight she had had with Johnson. Poeschel repeatedly told Belmonte she did not believe Belmonte was telling the whole truth. Belmonte told Poeschel she did not know about Jordan's broken bones. Poeschel showed Belmonte x-ray pictures revealing the broken bones. It was after this that Belmonte first said Johnson threw and punched Jordan. Two of the interviews were recorded. A portion of the recording was played for the jury and a transcript was provided. Poeschel also testified that neither she nor the prosecutor ever threatened to take Belmonte's plea deal away because they did not believe she was telling the whole truth.

"In the partial transcript of the interviews that is included in the appellate record, Poeschel tells Belmonte she thinks Belmonte might be hiding some of the facts to deny her own responsibility. She also says Belmonte is protecting Johnson. Poeschel further suggests that Belmonte knew Jordan had been hurt on the night he died, but then she left the apartment, smoked marijuana and got drunk. Poeschel claims to have spoken to inmate witnesses who supported this account. Belmonte says she has been threatened and believes that if she provides information that will result in a life sentence for Johnson, Johnson will cause her to be attacked

or killed while in prison. Then she cries and begins giving an account similar to the account in her testimony, starting with the time when she re-enters the living room after being assaulted by Johnson in the bedroom and sees Johnson holding Jordan upside down by one foot.

"Lonnie Richardson, a neighbor of Belmonte and Johnson, testified that, in October 2010, she heard an argument between them through the wall. She heard Johnson say, 'Be the mother and get your [ass] in here and take care of him before I beat the hell out of him.'

"Nada Yorke, a social worker, testified for the prosecution as an expert on battered women's syndrome (or intimate partner battering syndrome, as it also is called). Among other things, Yorke said that abused people often lie to conceal their situations from child welfare authorities in an effort to keep their children out of foster care, especially if they were placed in foster care as children themselves, as Belmonte was. Yorke also said that the cycle of abuse can continue even when one or both parties to an abusive relationship are in prison.

"A police officer testified that the temperature of the running water in the apartment was checked. The hot water in the kitchen and the bathroom reached 148 degrees within two minutes of being turned on. The hot water heater was set on high.

"The defense called a witness who was sworn in as Allen Ladsky. He said he was in jail in January 2011 in a cell next to Johnson's cell, when he overheard a conversation between Johnson and Belmonte. He heard Belmonte tell Johnson 'something like even if—no matter what, even though I did [it], we're both going to go down for it, or something of that sort.' Ladsky testified that he was present in court against his will and believed Belmonte would use gang associates to retaliate against him. The court had to order Ladsky to testify, telling him that if it ruled him in contempt, it could keep him in custody until the end of the trial, which was scheduled to last nearly three more weeks.

"An investigator named Daniel Stevenson with the district attorney's office testified that Ladsky told him he fabricated the story about overhearing a conversation between Johnson and Belmonte. Ladsky said he did this at Johnson's request. Stevenson said Ladsky made this statement after Stevenson told Ladsky that Stevenson could 'go to bat' for Ladsky. Ladsky testified that he did indeed tell Stevenson he fabricated the story; this was a lie; and he told Stevenson the lie hoping it would cause Johnson's counsel not to call Ladsky as a witness at trial so he could avoid testifying and facing retaliation.

"Ladsky was impeached with prior convictions of falsely identifying himself to police, possessing drugs for sale, resisting arrest, and possessing stolen property.  He also said he was a former member of a white supremacist gang, he had a swastika tattooed on his arm, and Allen Ladsky was not his real name.  Ladsky testified that he saw Belmonte's face and could pick her out of a lineup, but Stevenson testified that he showed Ladsky a photo lineup including Belmonte, and Ladsky could not identify her.

"The defense called Juan Garza, an investigator with the public defender's office, who testified that he spoke with Nelson, the paramedic, in 2012.  At that time, Nelson recalled that, when he responded to Belmonte's 911 call, Belmonte acted suspicious.  She seemed nervous, her account of events did not make sense, and she was not upset or crying.

"Detective Heredia, called back as a defense witness, testified that when he interviewed Belmonte shortly after Jordan's death, Belmonte did not mention that Johnson assaulted her the night before.  Heredia did not see any signs of injury on Belmonte.

"Finally, Jeff Cameron, a deputy coroner, testified for the defense that he saw and touched Jordan the morning Jordan was brought to the hospital.  Jordan was warm and not stiff.  Cameron was not a medical doctor.

"In her closing argument, the prosecutor presented several alternative theories of murder to the jury.  She said it could find first degree murder by finding that Johnson picked Jordan up by one foot and then threw and punched him, as Belmonte testified.  When Johnson picked Jordan up, he intended to kill Jordan and he had time to deliberate and reflect on what he was doing.  'I would argue to you that why else do you throw and punch a 33-day-old baby,' the prosecutor said.

"Next, the prosecutor explained that the jury could find second degree murder in a number of different ways.  It could find that Johnson intended to kill Jordan but did not premeditate and deliberate.  It also could find that Johnson did not intend to kill Jordan—only to abuse or hurt him—but inflicted the blows with conscious disregard for his life.  Or it could disbelieve Belmonte and find that she inflicted the beating, but could also find that Johnson, being Jordan's father and having a duty to protect him, failed in this duty and did so with conscious disregard for Jordan's life.

"On the second count, assault on a child under eight resulting in death, the prosecutor told the jury it could find Johnson guilty if it found

9.

that Johnson inflicted the beating; that a reasonable person would think the beating was likely to produce great bodily injury; that Jordan died from it; and that Jordan was in Johnson's care and custody.

"For the third count, child abuse, neglect or endangerment, the prosecutor focused on the burns and the failure to get them treated. If Jordan was in Johnson's care and custody and the circumstances were likely to cause great bodily injury, the jury could find Johnson guilty if it believed Johnson willfully or with criminal negligence caused the burns and failed to get treatment, or if it believed Belmonte inflicted the burns, and Johnson willfully or with criminal negligence failed to get treatment. The jury could find true the enhancement allegation for this count only if it found that Johnson personally inflicted the burns on Jordan.

"The prosecutor also explained that the jury could find Johnson guilty of any of the first three counts under a theory that he aided and abetted Belmonte.

"Defense counsel, in his closing argument, urged the jury to find Johnson not guilty of counts 1 and 2 and guilty of count 3, and to find the enhancement allegation on count 3 not true. His theory was that Belmonte inflicted both the beating and the burns as revenge against Johnson for Johnson's abuse of her and because of her animosity toward boys. When Belmonte was beating Jordan to death, Johnson was asleep. Johnson was guilty only of failing to get treatment for the burns. Defense counsel denied that the burns were proved to be a substantial factor in causing Jordan's death." (*People v. Johnson*, *supra*, F067359, fn. omitted.)

On February 16, 2011, the Kern County District Attorney filed an information charging petitioner with first degree premeditated murder (§ 187, subd. (a); count 1), custodial assault of a child under eight years of age, resulting in death (§ 273ab; count 2), child endangerment with an enhancement for personal infliction of great bodily injury (§§ 273a, subd. (a), 12022.7; count 3) and resisting arrest (§ 148, subd. (a)(1); count 4).[4]

On April 9, 2013, a jury convicted petitioner on count 1 of the included offense of second degree murder. The jury found petitioner guilty as charged on counts 2 through 4, but found not true the great bodily injury enhancement to count 3.

---

[4] Belmonte was charged as a codefendant in counts 1 through 3. She is not a party to this appeal.

10.

On May 7, 2013, the trial court sentenced petitioner on count 2 to a term of 25 years to life, on count 3 to a consecutive, determinate term of six years, and on count 4 to a concurrent 30-day term. On count 1, the court imposed and stayed a sentence of 15 years to life (§ 654). Judgment was entered on May 9, 2013.

Petitioner appealed and, on March 17, 2015, this court affirmed the judgment subject to conditions not relevant here. (*People v. Johnson*, *supra*, F067359.)

On February 14, 2019, petitioner, *in propria persona*, filed a petition for resentencing pursuant to section 1170.95. In the form petition, petitioner stated that a complaint, information, or indictment was filed against him that allowed him to be prosecuted under a theory of felony murder or murder under the natural and probable consequences doctrine; he was convicted of first or second degree murder at trial; and he could not now be convicted of first or second degree murder because of changes made to sections 188 and 189, effective January 1, 2019.

On February 22, 2019, the court appointed counsel to represent petitioner on the petition.

On March 1, 2019, the People filed a motion to dismiss the petition, arguing section 1170.95 is unconstitutional. On February 10, 2020, the People filed an opposition to the petition on the merits. Therein, the People argued petitioner was not convicted pursuant to a felony murder theory or the natural and probable consequences doctrine. The People specifically asserted that the jury was not instructed on the natural and probable consequences doctrine, nor did the People argue this theory at trial. Petitioner, through counsel, filed replies to both the motion to dismiss and the opposition.

On June 3, 2020, the court denied the petition. The court noted that, in determining resentencing eligibility, the court was permitted to consider "the petition itself, in addition to records of conviction that are readily available to the Court," including "the Abstract of Judgment, the Information or the charging documents, verdict form, [and] the opinion authored by the Court of Appeal." The court noted that it had

11.

considered those documents, as well as the jury instructions, and had "heard and [was] very familiar with this case." The court continued:

> "The Court finds that the People did not proceed under a theory of felony murder or murder under the natural and probable consequences doctrine, as the defendant was either the principal in the murder or his conduct directly led to the death of the victim."

On that basis, the petition was denied. This timely appeal followed.

## DISCUSSION

### I. Senate Bill No. 1437 (2017-2018 Reg. Sess.) and Section 1170.95

Effective January 1, 2019, the Legislature passed Senate Bill No. 1437 "to amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).) The bill accomplished this task by adding three separate provisions to the Penal Code. (*People v. Gentile* (2020) 10 Cal.5th 830, 842 (*Gentile*).) First, to amend the natural and probable consequences doctrine, the bill added section 188, subdivision (a)(3), which requires a principal to act with malice aforethought before he or she may be convicted of murder. (§ 188, subd. (a)(3); accord, *Gentile*, at pp. 842–843.) Second, to amend the felony-murder rule, the bill added section 189, subdivision (e):

> "A participant in the perpetration or attempted perpetration of [qualifying felonies] in which a death occurs is liable for murder only if one of the following is proven:  [¶]  (1) The person was the actual killer.  [¶]  (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree.  [¶]  (3) The person was a major participant in the underlying felony and acted with reckless

indifference to human life, as described in subdivision (d) of Section 190.2."[5]  (§ 189, subd. (e); accord, *Gentile*, at p. 842.)

Finally, the bill "added section 1170.95 to provide a procedure for those convicted of felony murder or murder under the natural and probable consequences doctrine to seek relief under the two ameliorative provisions above." (*Gentile*, at p. 843.)

"Section 1170.95 lays out a process for a person convicted of felony murder or murder under a natural and probable consequences theory to seek vacatur of his or her conviction and resentencing." (*Gentile*, *supra*, 10 Cal.5th at p. 853.)  First, "an offender must file a petition in the sentencing court averring that:  '(1) A complaint, information, or indictment was filed against the petitioner that allowed the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine[;] [¶] (2) The petitioner was convicted of first degree or second degree murder following a trial or accepted a plea offer in lieu of a trial at which the petitioner could be convicted for first degree or second degree murder[;] [¶] [and] (3) The petitioner could not be convicted of first or second degree murder because of changes to Section 188 or 189 made effective January 1, 2019.'  (§ 1170.95, subds. (a)(1)-(3); see also § 1170.95[,] subd. (b)(1)(A).)  Additionally, the petition shall state '[w]hether the petitioner requests the appointment of counsel.'  (§ 1170.95, subd. (b)(1)(C).)  If a petition fails to comply with subdivision (b)(1), 'the court may deny the petition without prejudice to the filing of another petition.'  (§ 1170.95, subd. (b)(2).)"  (*People v. Lewis* (2021) 11 Cal.5th 952, 959–960 (*Lewis*).)

Where the petition complies with the requirements of section 1170.95, subdivision (b)(1), counsel must be appointed, if requested.  The prosecutor must file a response and the petitioner may file a reply.  The trial court must then review the petition

---

[5]  Additionally, section 189 was amended to allow for felony-murder liability where the victim is a peace officer.  (§ 189, subd. (f); accord, *People v. Daniel* (2020) 57 Cal.App.5th 666, 672, review granted Feb. 24, 2021, S266336.)

to determine if the petitioner has made a prima facie showing that he or she is entitled to relief. (*Lewis*, *supra*, 11 Cal.5th at pp. 961–963, 967; § 1170.95, subd. (c).) In making this determination, the court may rely on the record of conviction. (*Lewis*, at pp. 970–971.) However, the prima facie inquiry is limited and, at this stage of the proceedings, the court "should not engage in 'factfinding involving the weighing of evidence or the exercise of discretion.' " (*Id.* at pp. 971–972.)

If the court determines the petitioner has met his or her prima facie burden, "the trial court must issue an order to show cause and hold a hearing to determine whether to vacate the murder conviction and to resentence the petitioner on any remaining counts. (§ 1170.95, subds. (c), (d)(1).) At the hearing, the prosecution must 'prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing.' (§ 1170.95, subd. (d)(3).) 'The prosecutor and the petitioner may rely on the record of conviction or offer new or additional evidence to meet their respective burdens.' (*Ibid.*)" (*Gentile*, *supra*, 10 Cal.5th at p. 853.)

To demonstrate prejudice from the denial of a section 1170.95 petition before the issuance of an order to show cause, the petitioner must show it is reasonably probable that, absent error, his or her petition would not have been summarily denied without an evidentiary hearing. (*Lewis*, *supra*, 11 Cal.5th at pp. 972–974; see *People v. Watson* (1956) 46 Cal.2d 818, 836.)

## II.    The Trial Court Erred in Failing to Issue an Order to Show Cause

The trial court denied petitioner's petition for resentencing on the ground that he had not made a prima facie showing he was entitled to relief. Thus, the court did not issue an order to show cause or conduct an evidentiary hearing. The People concede this was error because neither the petition nor the record established that petitioner was

indisputably ineligible for resentencing.[6] (See *People v. Duchine* (2021) 60 Cal.App.5th 798, 815 (*Duchine*) ["[A]bsent a record of conviction that conclusively establishes that the petitioner engaged in the requisite acts and had the requisite intent, the trial court should not question [the petitioner's] evidence."]; accord, *Lewis*, *supra*, 11 Cal.5th at p. 971.)

The court found petitioner was ineligible for resentencing because he was not prosecuted or convicted under the natural and probable consequences theory. However, the record leaves room for doubt on this point. At trial, the jury was instructed on the degrees of murder and different theories of murder, including express and implied malice, deliberate and premeditated murder, unpremeditated murder of the second degree, and second degree murder resulting from an unlawful act (or intentional failure to act), the natural consequences of which are dangerous to life. The jury also was instructed on general principles of aiding and abetting, as well as the possibility of finding petitioner guilty of murder upon finding that he aided and abetted felony child endangerment, and that murder was a natural and probable consequence of the commission of that crime. The jury was further instructed on the elements of felony child endangerment and the requirements for finding personal infliction of great bodily injury as to that crime.

The prosecutor argued to the jury that petitioner beat his son to death and, alternatively, if Belmonte inflicted the fatal injuries, petitioner would be guilty as an aider and abettor. One of the theories argued by the prosecutor was that petitioner would be guilty of murder if he aided and abetted Belmonte in committing child endangerment, and the natural and probable consequence of such crime was murder. The prosecutor also argued petitioner would be guilty of murder if the jury concluded Belmonte burned the infant and petitioner allowed the infant to go untreated, because the infant's death would

---

**6** Petitioner argues the court was limited to reviewing the petition itself, and could not consider the record of conviction. Our Supreme Court recently held otherwise. (*Lewis*, *supra*, 11 Cal.5th at pp. 970–972.)

15.

be a natural and probable consequence of that negligence. In this regard, the prosecutor argued: "If you don't believe [Belmonte], you say, you know, she got that plea agreement, she is a liar, she's, you know, whatever, you can still find the defendant guilty by aiding and abetting. The natural and probable consequences doctrine that I just went over with you."

Based on the foregoing, it is possible the jury convicted petitioner on the theory that the infant's murder was the natural and probable consequence of child endangerment, which crime petitioner aided and abetted. We therefore cannot conclude, as a matter of law, that petitioner is ineligible for resentencing relief. (*Lewis*, *supra*, 11 Cal.5th at pp. 971–972; *Duchine*, *supra*, 60 Cal.App.5th at p. 815 [holding that, where the record is not dispositive of factual issues, "the time for weighing and balancing and making findings on the ultimate issues arises at the evidentiary hearing stage rather than the prima facie stage"].) The trial court erred in holding otherwise.

Because petitioner adequately alleged a prima facie claim for relief and the record does not rebut his allegations as a matter of law, the court was required to issue an order to show cause (§ 1170.95, subd. (c)), and to hold a hearing at which the prosecution bears the burden of proving his ineligibility for resentencing relief beyond a reasonable doubt, unless such hearing is waived (§ 1170.95, subd. (d)). The court erred in failing to follow these procedures. Neither party argues the error was harmless, and we cannot say it is reasonably probable the petition properly could have been denied without an evidentiary hearing on any other basis. (*Lewis*, *supra*, 11 Cal.5th at pp. 972–974; see *People v. Watson*, *supra*, 46 Cal.2d at p. 836.) Accordingly, we must reverse.

## III.     The Standard of Review on Remand

The parties dispute the standard of review to be applied at the evidentiary hearing. (§ 1170.95, subd. (d)(3).)

"At the hearing to determine whether the petitioner is entitled to relief, the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the

16.

petitioner is ineligible for resentencing." (§ 1170.95, subd. (d)(3).)  However, courts are split on what, precisely, this provision requires the prosecution to prove.  To prove ineligibility beyond a reasonable doubt, must the prosecution merely prove that a rational jury *could* find the petitioner guilty of murder on a still-valid theory of liability?  (See *People v. Duke* (2020) 55 Cal.App.5th 113, 123, review granted Jan. 13, 2021, S265309 ["This is essentially identical to the standard of substantial evidence, in which the reviewing court asks ' "whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt...." ' "].)  Or does section 1170.95, subdivision (d)(3) require the trial court to serve as an independent factfinder, to whom the prosecution must prove beyond a reasonable doubt that the petitioner *is* guilty of murder on a still-valid theory?  (See *People v. Fortman* (2021) 64 Cal.App.5th 217, 224–225, review granted July 21, 2021, S269228; *People v. Lopez* (2020) 56 Cal.App.5th 936, 949, review granted Feb. 10, 2021, S265974; *People v. Clements* (2021) 60 Cal.App.5th 597, 616–618, review granted Apr. 28, 2021, S267624; *People v. Rodriguez* (2020) 58 Cal.App.5th 227, 241–244, review granted Mar. 10, 2021, S266652; accord, *Duchine*, *supra,* 60 Cal.App.5th at pp. 814–815 [the "idea that the prosecution must prove beyond a reasonable doubt that there is substantial evidence in a prior record to support a hypothetical finding of guilt on a theory of murder that may never have been presented to a jury is beyond" incomprehensible].)

Our Supreme Court has granted review to resolve this split in *Duke*.  (*People v. Duke*, *supra*, 55 Cal.App.5th at p. 123, review granted.)  Additionally, the Legislature recently passed, and the Governor signed, a bill which "[r]eaffirms that the proper burden of proof at a resentencing hearing under [] section [1170.95] is proof beyond a reasonable doubt."  (Sen. Bill No. 775 (2021-2022 Reg. Sess.) Stats 2021, ch. 551, § 1, subd. (c).)  Effective January 1, 2022, Senate Bill No. 775 amends section 1170.95, subdivision (d)(3) to require the prosecution "to prove, beyond a reasonable doubt, that the petitioner

17.

is guilty of murder or attempted murder under California law as amended by the changes to section 188 or 189 made effective January 1, 2019." (Stats. 2021, ch. 551, § 2.)

Based on the foregoing, and consistent with the recent amendments to section 1170.95, subdivision (c), we join the "growing chorus" of courts that require an independent finding by the trial court, upon proof beyond a reasonable doubt, that the petitioner is guilty of murder on a still-valid theory. (*People v. Fortman*, *supra*, 64 Cal.App.5th at p. 221.)

## DISPOSITION

The June 3, 2020 order denying petitioner's section 1170.95 petition is reversed. On remand, the trial court is directed to issue an order to show cause and to conduct further proceedings as required under section 1170.95, subdivision (d), in light of the principles set forth herein.